**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| GREG HANSEN, individually and on behalf of those similarly situated, and RUDI KOHLBACHER, individually and on behalf of those similarly situated, RICHARD ZINS, individually and on behalf of those similarly situated, and MICHAEL NELSON, individually and on behalf of those similarly situated, <br><br>    Plaintiffs, <br><br>v. <br><br>AIR LINE PILOTS ASSOCIATION INTERNATIONAL, <br><br>    Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. ) ) ) ) ) ) |

**COMPLAINT – CLASS ACTION**

Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS, retired pilots for FedEx Corporation ("FedEx"), for their Class Action Complaint against Air Line Pilots Association International ("ALPA"), the union for FedEx pilots, state and allege as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff GREG HANSEN is a resident of Colorado and is a representative for the similarly-situated "Class" (as hereinafter defined).

2. Plaintiff RUDI KOHLBACHER is a resident of California and is a representative for the similarly-situated "Class."

3. Plaintiff RICHARD ZINS is a resident of Nevada and is the representative for the similarly-situated "Class."

4. Defendant ALPA is an airline pilot union headquartered in McLean, Virginia. In accordance with the National Mediation Board's certification in case number R-6450 dated October 29, 1996, as transferred from the FedEx Pilots Association to the Air Line Pilots Association ("ALPA") in File No. C-6762/Case No. R-6450, 29 NMB 320 dated May 29, 2002, FedEx recognizes ALPA as the duly authorized representative for the specific craft or class of flight deck crew members (the "Pilots") of the FedEx covered by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq*.

5. This case arises out of ALPA's breach of its duty of fair representation to Plaintiffs and the Class defined herein under the RLA. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1337.[1]

6. A substantial part of the events or omissions giving rise to the claim occurred in this judicial district; specifically, in Memphis, Tennessee. Therefore, venue is proper in this Court under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**Negotiations of Collective Bargaining Agreements between ALPA and FedEx**

7. ALPA's representation of FedEx pilots is subject to the ALPA Administrative Manual ("Manual").

8. The Manual sets forth the powers and duties of the Master Executive Council ("MEC") and the Negotiating Committee ("NC"). The MEC is made up of elected

---

[1] "[T]he statutory basis of jurisdiction is § 1337, since the cause of action against the Union derives from statute, not contract." *Suwanchai v. Int'l Bhd. of Elec. Workers*, 528 F. Supp. 851, 854 n. 3 (D.N.H. 1981) (citations omitted); *see also Brady v. Trans World Airlines, Inc.*, 401 F.2d 87, 94 (3d Cir. 1968) (finding federal jurisdiction over fair representation claim against union).

representatives of an airline system-wide. The NC is selected by the MEC. When an act or omission of ALPA is referenced, it should be construed to include the MEC and/or NC.

9. Section 40.3.J of the Manual sets forth the policies and procedures for the allocation of "Lump Sum Payments," defined as "any allocation of . . . retroactive payments, contract signing bonuses, . . . or other forms of fixed value received by a pilot group from its company under the terms of a collective bargaining agreement (including letters of agreement and similar forms of agreement) on a one-time or periodic basis . . ." Additionally, "For purposes of this [Lump Sum Payment] policy, the terms 'pilot group,' 'pilot' and 'pilots' shall include former and retired pilots included in the allocation of a Lump Sum Payment." Manual Excerpt, **Ex. A**.

10. Lump Sum Payments arise during negotiation of a new collective bargaining agreement ("CBA"), after the end of the prior CBA. A CBA governed by the RLA does not expire at the end of its term but rather becomes "amendable" and employees must continue to work under the old CBA until a new one is negotiated. The time period between the amendable date of the prior CBA and the beginning of the new CBA is called the "amendable period."

11. Pilots are not allowed to strike or stop work when a CBA becomes amendable; therefore, it often takes years to negotiate a new CBA.

12. During the amendable period, the RLA requires pilots to continue working for the lower wage rates under the prior CBA.

13. As a result, the company's obligation to make a payment representing the difference between the compensation that should have been paid based upon the new wage

increases and the amount actually paid during the amendable period is a significant part of negotiations between the pilots and the company (i.e., the Lump Sum Payment).

14. Retroactive pay is an integral part of any CBA negotiation for ALPA. It compensates its members who were forced to work for lower wages during the amendable period. Retroactive pay compensates pilots for working at lower wage rates of the old CBA during the time between the amendable date of the old CBA and starting date of the new CBA. In order to deters carriers from delaying negotiations, Section 40.5.C.2 of ALPA's Manual provides that every effort shall be made to secure retro pay effective from the amendable date:

> In the negotiation of agreements, every reasonable effort shall be made to achieve and maintain the following:
>
> . . .
>
> In order to prevent costly procrastination by airline managements during contract negotiations, ALPA advocates the retention of a retroactivity factor effective from the contract amendable date.

Manual Excerpt, **Ex. A**.

15. When FedEx and ALPA agree on terms for a new CBA, they execute a tentative agreement ("TA"). The TA goes to ALPA membership for ratification, and if ratified, it is executed as a CBA.

16. The TA typically contains a Letter of Agreement ("LOA") between FedEx and ALPA. The LOA sets forth how Lump Sum Payments (i.e., retroactive payments) are allocated among pilots who were active during some or all of the amendable period. The LOA is part of the CBA if the CBA is ratified and executed.

17. Under Section 40.3.J of the Manual, the MEC has the authority to decide how to allocate the Lump Sum Payment negotiated for retro pay. The MEC is required "to consider the purposes or reasons for the Lump Sum Payment *and* to apply relevant factors in light of these purposes or reasons. . . . Relevant factors may include but are not limited to pilots' past, current, or projected rates of pay, relative seniority and/or longevity, per capita or pro rata distribution or a combination thereof, benefits, employment status (for example, active, furloughed, discharged or suspended with grievance pending, retired, resigned, or death before the payment of the allocation proceeds, paid or unpaid leave status such as military, parental, medical, disability, ALPA, management, or for other reasons and other contractual or other leaves [sic])." Manual Excerpt, **Ex. A.**

18. Section 40.3.J of the Manual also provides, "It is important that the MEC consult with ALPA legal counsel and with any staff/officers/representatives designated by the President and provide information to the pilot group on its decision(s)." *Id.*

**Lump Sum Payments under Prior and Proposed LOAs**

19. On February 24, 2013, a CBA between FedEx and ALPA became amendable without a new CBA in place. FedEx pilots were paid under that CBA's compensation terms while FedEx and ALPA negotiated a new CBA.

20. Effective November 2, 2015, FedEx and ALPA executed the "2015 CBA." The 2015 CBA had a term lasting through November 1, 2021.

21. The 2015 CBA included a Lump Sum Payment in the LOA ("2015 LOA") that covered an amendable period of February 25, 2013, through August 19, 2015.

22. Under the 2015 LOA, different classes of pilots (captains, first officers, and second officers) for different types of aircraft (wide- or narrow-body) were eligible to receive different amounts of Lump Sum Payments.

23. Under the 2015 LOA, the Lump Sum Payment was allocated by the MEC per capita, or proportionate to the amount of time the pilot was active during the amendable period. Thus, for example, a wide-body captain who was active for the first year of the amendable period and then retired, and a wide-body captain who was hired and remained active for the last year of the amendable period, received the same amount of retroactive payment.

24. The 2015 CBA became amendable November 1, 2021, without a new CBA in place. Active pilots, including Plaintiffs and Class members, were paid lower wages under the 2015 CBA while FedEx and ALPA negotiated a new CBA.

25. In 2023, a TA ("2023 TA") was proposed to FedEx membership. Under the 2023 LOA, the MEC allocated the Lump Sum Payment per capita without regard to pilot rank or aircraft type, proportionate to the amount of time the pilot was active during the amendable period (including retirees). The pilot membership vote on the 2023 TA failed and negotiations continued.

**ALPA's Bad Faith Development and Implementation of an Arbitrary and Discriminatory Lump Sum Payment Methodology for the 2026 LOA**

26. After the 2023 TA failed, Alan Bjorklund, a FedEx first officer, became the new head of the NC.

27. Bjorklund over-promised what he could achieve regarding retroactive payments.

28.     FedEx agreed to pay a lump sum of $625 million for retroactive pay. The amount Bjorklund negotiated was short of the amount needed to reach the goal he promised for the Lump Sum Payment. In order to compensate for the shortfall, he and the NC devised an unprecedented allocation methodology for the "2026 LOA" that punishes and significantly devalues the work of retirees during the amendable period.

29.     The 2026 LOA Lump Sum Payment methodology back-weighted the payments in a manner that bears no relationship to the amount of wage loss the pilots suffered while working for the lower wages of the 2015 CBA during the amendable period. Pilots working during the last months of the amendable period receive $11,155 per month (bid period), while pilots working during the first months of the amendable period receive $100 per month. There is no rational basis for this 11,055% increase during a time when inflation was 20%.[2]

30.     The 2026 LOA Lump Sum Payment methodology is as follows:

   a.     November 2021 and December 2021 bid periods:[3] $100/month (captain) and $69/month (first officer);

   b.     January 2022–December 2022 bid periods: $256/month (captain) and $176/month (first officer);

   c.     January 2023–December 2023 bid periods: $658/month (captain) and $452/month (first officer);

   d.     January 2024–December 2024 bid periods: $1,687/month (captain) and $1,158/month (first officer);

---

[2] https://www.bls.gov/data/inflation_calculator.htm (Percentage change in Consumer Price Index - All Urban Consumers (CPI-U) from November 2021 to June 2026).

[3] A "bid period" is a calendar month.

e.   January 2025–December 2025 bid periods: $4,328/month (captain) and $2,971/month (first officer);

f.   January 2026–May 2026 bid periods: $11,100/month (captain) and $7,597/month (first officer); and

g.   June 2026 bid period: $11,155/month (captain) and $7,659/month (first officer).

*See* 2026 LOA, **Ex. B**.[4]

31.   Under the 2026 LOA methodology, pilots with full seniority, i.e., the retirees, suffered more wage loss during the amendable period than pilots with less seniority who have not reach full seniority pay grades.

32.   Under the 2026 LOA, a captain who was active the first 6 months of the amendable period receives $1,224, but a captain who was only an active pilot the last 6 months of the amendable period receives $66,655–over 54 times more.

33.   Also, the methodology arbitrarily and disproportionately rewards the first officers who were promoted to captain to replace captain retirees.[5]

34.   The 2026 LOA allocation of the Lump Sum Payment bears no relation to the amount of lost wage increases suffered by pilots working under the 2015 CBA. Yet the Lump Sum Payment is supposed to compensate the pilots for the increased pay they did not receive during the amendable period.

35.   In April 2026, the MEC met with Bjorklund and ALPA counsel about the proposed 2026 TA, including the 2026 LOA allocation methodology. Bjorklund and/or ALPA

---

[4] Plaintiffs do not currently have a copy of an executed 2026 CBA. Upon information and belief, the 2026 CBA includes the attached 2026 LOA as proposed in the 2026 TA.

[5] Most retirees retired as captains.

counsel made multiple misrepresentations to the MEC about the allocation methodology.

36.    Bjorklund and/or ALPA counsel represented to the MEC that the allocation methodology was consistent with the methodology used by the Southwest Airlines Pilots Association ("SWAPA")[6] in their recent LOA. That is not a true statement for multiple reasons. First, the SWAPA methodology is based on the pilot's actual earnings during the amendable period. Using actual wages incorporates differences in seniority, rank and changes in rank (captain or first officer), and the factor of the actual wage increase loss. Second, SWAPA tied the actual wages earned to an estimation of the foregone wage increases during the amendable period. The estimated wage increases during the amendable period were: 1.5%, 5.6%, 14.0%, and 23.0%. This approximated the timing of the 29.15% wage increase during the three-and-one-quarter-year amendable period.

37.    Bjorklund and/or ALPA counsel represented to the MEC that the allocation methodology was consistent with the methodology used by the ALPA United Airlines (UAL) MEC pilots bargaining unit. That is also a false statement. First, the UAL methodology is based on the pilot's actual earnings during the amendable period. Using actual wages incorporates differences in seniority, rank, and changes in rank, and the factor of the actual wage increase loss. Second, the UAL MEC methodology tied the actual wages earned to an estimation of the foregone wage increases during the amendable period. The estimated wage increases during the

---

[6] SWAPA is a union representing Southwest Airlines pilots. SWAPA is not affiliated with ALPA.

amendable period were 4%, 4%, 14%, and 14% of earnings (for the years 2020 through 2023). The increase in percentages for each period was consistent with the estimated wage increases during the amendable period based on the wage increase under the new 2023 CBA.

38.   SWAPA and the ALPA UAL MEC did the opposite of what the NC proposed for the 2026 LOA Lump Sum Payment allocation. Both SWAPA and the ALPA UAL MEC used percentages increases for each period to approximate the estimated wage increases the pilots lost during the amendable period. Both tried to approximate the wage increases the pilots' lost wages by not receiving wage increases during the amendable period. Here, the unprecedented 2026 LOA methodology did not attempt to allocate the Lump Sum Payment in a manner that had any relation to the wages increases lost by the pilots working for the lower wages rates of the 2015 CBA during the amendable period.

39.   Bjorklund and/or ALPA counsel represented to the MEC that the retroactive payment was not subject to the Manual's Lump Sum Payment terms because it was not a lump sum distribution. That is not a true statement. FedEx paid a lump sum of $625 million as compensation for the wage increases not received during the amendable period.

40.   In an apparent effort to avoid the required analysis and treatment of Lump Sum Payments under the Manual (Section 40.3.J), the 2026 LOA refers to Lump Sum Payments as "Amendable Period Recovery Payments," or APRP. Regardless of the label, this amount was negotiated to compensate pilots who worked under the prior CBA during the amendable period (*i.e.*, retroactive pay).

41.     The 2026 LOA provides, "The APRP will be made in a single payment as soon as practicable following the effective date of the new amended Agreement, but no later than September 15, 2026." 2026 LOA, **Ex. B.**

42.     The APRP is a "retroactive payment" and/or "other form . . . of fixed value received by a pilot group from its company under the terms of a collective bargaining agreement (including letters of agreement and similar forms of agreement) on a one-time or periodic basis," which falls under the Lump Sum Payment definition in the Manual. Manual Excerpt, **Ex. A**. Clearly, the APRP is a lump sum distribution and "Lump Sum Payment" as defined in the Manual.

43.     Attempting to avoid its obligations under the ALPA Manual by giving the Lump Sum Payment a different name is evidence of the irrational, arbitrary, and bad faith actions of ALPA, the MEC, and the NC.

44.     Bjorklund and/or ALPA counsel represented to the MEC that retirees were not part of the craft or class represented by ALPA under the RLA, so the retirees are owed nothing.

45.     Retirees are class or craft and are represented by ALPA. *See* paragraph 5, *supra*.

46.     The 2026 LOA includes Lump Sum Payments (APRP) for retirees. Therefore, ALPA cannot allege that ALPA was not representing retirees.

47.     ALPA had a duty to fairly represent retirees.

48.     Additionally, in negotiating the amount of money FedEx was going to set aside for retroactive payments, ALPA considered the wages of active pilots during the amendable period, including those of now-retirees.

49.    Bjorklund and/or ALPA counsel also represented to the MEC that the 2026 LOA APRP calculation followed the 2023 LOA APRP methodology. That is not a true statement.

50.    The 2026 LOA does not follow the 2023 LOA. The 2023 LOA followed the 2015 LOA, which paid pilots proportionally based on the time they were active pilots in the amendable period. The 2026 LOA has a novel, arbitrary, irrational, and discriminatory methodology arrived at in bad faith to penalize retirees and reward current pilots.

51.    Based on the misrepresentations of Bjorklund and/or ALPA counsel, the MEC voted to approve the 2026 TA and it was submitted to active pilots for a vote.

52.    Contrary to Section 40.3.J.1 of the Manual, the MEC did not provide information to the "pilot group" (which includes retired pilots) on its decisions.

53.    Contrary to Section 40.3.J.1 of the Manual, the MEC did not consider the relevant factors before deciding on the 2026 LOA allocation methodology.

54.    The NC submitted the terms of the 2026 LOA to the MEC with insufficient time to consider the provisions or for the MEC Block Representatives to review the information with constituents or provide input to the final product. The MEC only had time to rubber-stamp the NC's 2026 LOA.

55.    The MEC's vote was not unanimous. MEC Block 5 Representative, Chris Turner, dissented. Turner explained his reasons for voting "no" to the voters, including: "I believe in leaving no one left behind [sic] - ensuring TA includes everyone back to amen[d]able date and all new hires going forward. In my opinion, this TA failed to provide a fair and equitable Amendable Period Recovery Payment to retirees and

resignees. The APRP methodology seems arbitrary in that the calculations do not match what other airlines used. The methodology has never been used by our union and is without precedence." Turner Statement, **Ex. C**.

56. Turner continued: "APRP Wow...Didn't see that coming...During the last several months, the MEC was removed from NC discussions or decisions regarding any of the sections left (pay, retirement, scope, and APRP), and we provided zero input to the Amendable Period Recovery Payment methodology. I am simply in disbelief that someone who retired in July 2023, under TA 1 would have been eligible for $30,450. Under this TA, that same retiree gets roughly $7,878. Had we applied the TA 1 flat dollar APRP method, that same retiree would have gotten roughly $56,251. Any of our pilots forced from Capt to FO during this time are also disproportionally affected and will receive less overall. The justification given by the NC was that other peer airlines used a similar graduated scale with increasing amounts (like 4%/4%/14%/23%) based on W-2 income. The TA APRP does not use income but instead results in a random application of total amounts possible. For Nov & Dec 2021 the proportion would be paid .02% (of the $150,000). In 2022, 2.05% of total; 2023 5.27%; 2024 13.51%; 2025 34.66%; and 2026 44.37%. I voted NO to send the TA to membership in the current form as I believe we could have at least honored our retirees and adjusted this back to a 2023 methodology. I do not believe the NMB would have needed to be involved since it was a Letter of Agreement with the Company." *Id.*

57. Shortly after the 2026 TA was submitted for a vote, MEC members who had approved the TA began expressing concerns about the retroactive payment allocation

methodology. On April 20, 2026, Brian Hoffman, Seniority Block 2 Representative, sent an email to Bjorklund and ALPA counsel in which he said that, while they had briefed the MEC that the methodology followed SWAPA's, when he plotted the increases, the SWAPA and other methodologies showed linear growth throughout the amendable period, while the 2026 LOA methodology showed exponential growth. Hoffman Email, **Ex. D**. After another representative asked why Mr. Hoffman was concerned, the two were admonished that the "Legal consensus" was to not to discuss by email or text. *Id.*

58.     ALPA and the NC violated the Manual and its duty to retirees by forcing an arbitrary, irrational methodology through the MEC without following protocol. The Manual makes the MEC, not the NC, responsible for assuring ALPA fulfills its duty of fair representation when considering the allocation of any Lump Sum Payment under Section 40.3.J of the Manual.

59.     The retiree pilots are class or craft (*see* paragraph 5, *supra*) and were represented by ALPA during the amendable period. The retiree pilots paid ALPA dues during the amendable period. ALPA negotiated the lump sum payment from FedEx. ALPA was the retiree pilots' exclusive negotiating representative; the retirees did not have the ability to have anyone else represent them. The retiree pilots were represented by ALPA.

**The Class**

60.     Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS bring this action on behalf of certain similarly-situated individuals ("Class"), composed of and defined as follows:

a. "Eligible Pilots" as defined in the 2026 LOA;

b. Between November 2, 2021, and April 15, 2026, (1) retired at 65 years old as mandated under federal law or (2) voluntarily retired and did not pursue or accept subsequent full-time employment as a pilot for FedEx or any other airline certificated under 14 C.F.R. Part 121 at any time before June 29, 2026.

**The Class Meets the Requirements of FED. R. CIV. P. 23(a).**

**Numerosity**

61. The Class is so numerous that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1).

62. There are approximately 650 members of the Class.

63. "While no strict numerical test exists, 'substantial' numbers of affected [persons] are sufficient to satisfy this requirement." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012). *See Afro Amer. Patrolmens League v. Duck*, 503 F.2d 294, 298 (6th Cir. 1974) (finding 35 class members sufficient for numerosity); *Isabel v. Velsicol Chem. Corp.*, No. 04-2297 DV, 2006 U.S. Dist. LEXIS 42279, at *11–12 (W.D. Tenn. Jun. 20, 2006) (unpublished) (citation omitted) ("Generally, the numerosity requirement is fulfilled when the number of class members exceeds forty.").

64. "Relevant circumstances other than number include judicial economy arising from avoidance of a multiplicity of actions; geographic disbursement of class members; size of individual claims; financial resources of class members; the ability of claimants to institute individual suits; and requests for prospective injunctive relief

which would involve future class members." *Id.* at *11 (citing Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 3:6 (4th ed. 2006)).

65.   Joinder is impracticable because Class members live at least across the United States, if not the rest of the world. *Cf. Demarco v. Edens*, 390 F.2d 836, 845 (6th Cir. 1968) (suggesting 16 putative plaintiffs does not necessarily justify class action, especially where most, if not all, "live in the same geographical area as the plaintiffs"). A class action consolidating all putative plaintiffs' claims in one action avoids multiplicity of actions.

66.   Joinder is impracticable because of the size of the Class members' individual claims. Depending on their retirement date, their claims vary in size from a couple thousand dollars to about $144,000. Most if not all class members could not bring cost-effective individual lawsuits. *See Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 188–89 (N.D. Ill. 1992) (rejecting challenge to certification because one claim exceeded [in 1992 dollars] $300,000, as others "may have losses of less than $50,000" and it would be "very likely that these investors would be unable to proceed with individual actions").

**Commonality**

67.   There are questions of law or fact common to the Class. FED. R. CIV. P. 23(a)(2).

68.   "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). "What matters to class certification . . . is not the raising of common 'questions'–even in droves–but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.

Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (citation omitted, emphasis in original).

69. The Class has the same injury (financial loss) because of one common answer: ALPA breached its duty of fair representation to the class by establishing the retroactive payment methodology in the 2026 LOA.

70. The Class members' injuries are capable of classwide resolution through a mathematical formula. The only variable is when each member retired, which determines their individual damages amount. Differences in individual damages do not defeat class certification. *See Pickett v. City of Cleveland*, 140 F.4th 300, 310 (6th Cir. 2025) (citing *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) and *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54 (2016)) ("The fact that some members . . . may not be eligible for damages, or may receive damages in varying amounts, does not invalidate the district court's certification of the Class based on a common question.").

**Typicality**

71. The claims of Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS are typical of the claims of the Class. FED. R. CIV. P. 23(a)(3).

72. "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (citation omitted).

73.    Just like the rest of the Class, Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS's claim arises from ALPA establishing the 2026 LOA methodology in violation of its duty of fair representation to the retirees.

**Adequacy of Representation**

74.    Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS will fairly and adequately protect the interests of the Class. FED. R. CIV. P. 23(a)(4).

75.    The test for adequacy of representation is "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Am. Med. Sys.*, 75 F.3d at 1083 (citations omitted).

76.    Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS have common interests with unnamed members of the Class. They suffered the same injury as them. Their recovery will only vary from other class members based on the number of bid periods (months) they worked during the amendable period. Accordingly, Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS will vigorously prosecute the interests of the Class.

77.    The interests of Plaintiffs and the Class do not conflict and are not antagonistic to each other. All suffered the same type of injury (financial loss) as a result of ALPA's conduct.

78.    Counsel is qualified to represent the Class. Jacie Zolna and Ben Swetland are experienced class action attorneys with experience litigating claims against ALPA. Frank Watson III is an experienced attorney with substantial jury trial and class action experience. Randall Calvert is an experienced attorney with substantial jury

trial experience. Additionally, counsel are "prepared, if need be, to prosecute" this case with attorneys from their own offices and the attorneys who appear alongside them in this case. *See UAW v. GMC*, 497 F.3d 615, 626 (6th Cir. 2007).

**The Class Meets the Applicable Requirements of FED. R. CIV. P. 23(b).**

79.    Prosecuting separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for ALPA. FED. R. CIV. P. 23(b)(1).

80.    All Class members were injured the same way by the same conduct of ALPA. Class members are located in many different places. There is a risk of a trial court or even circuit split if, for example, courts rule differently on the scope of ALPA's duty to retirees. It is better to come to one conclusion in this Court.

81.    Questions of law or fact common to Class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. FED. R. CIV. P. 23(b)(3). Predominance is established by showing (1) that the existence of individual injury resulting from the alleged conduct is capable of proof at trial through evidence common to the class rather than individual to its members and (2) damages resulting from that injury are measurable on a class-wide basis through use of a common methodology. *Comcast Corp. v. Behrend*, 569 U.S. 27, 30 (2013).

82.    The evidence of Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS and the Class will be the same, as the conduct of ALPA injured the entire class the same way.

83. Class members' damages will be measured through use of a common methodology: a formula in which the only variable is a class member's retirement date. That date will determine how many months the member was active before retirement, and thus how much the back-weighted 2026 LOA methodology harmed him or her.

84. The Class members' interests in individually controlling the prosecution of separate actions, the desirability or undesirability of concentrating litigation in this forum, and the likely difficulties in managing a class action are addressed in this Complaint. FED. R. CIV. P. 23(b)(3)(A, C, & D).

85. To Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS's knowledge, no litigation has begun by or against any Class members. FED. R. CIV. P. 23(b)(3)(B).

**The LOA Does Not Provide a Grievance Procedure for Intra-Union Disputes; There Are No Administrative Remedies to Exhaust.**

86. Section D.3. <u>Disputes</u>, of the 2026 LOA provides:

a. Disputes growing out of the application or execution of this LOA shall be subject to Section 20 of the basic Agreement. The Section 20.B.1. timeline for filing of a grievance shall not commence until 30 days from ALPA's distribution of APRP data to the pilots, or, for pilots returning from service in the uniformed services for more than 30 days (long term military leaves of absence) until 60 days from the pilot's return to active status. A single Section 20.D.1. hearing shall be held no later than 15 days (unless another date agreed to by the parties) for any disputes not involving a pilot(s) returning from service in the uniformed services for more than 30 days. For a dispute involving a pilot(s) returning from service in the uniformed services, the hearing shall be held out of order and without consideration of prior filed Section 20 grievances.

b. A single, non-disciplinary Section 21.A.2. 3-person System Board shall have and retain jurisdiction for any Section 20.E. appeal from a decision rendered in a dispute as described in Paragraph D.3.a. above.
2026 LOA, **Ex. B**.

87.     Section 20 Grievances: Administration, of the CBA applies only to grievances with

FedEx. "Any pilot, group of pilots . . . or the [ALPA] on behalf of such pilot(s) who

has a grievance concerning any action of [FedEx] affecting the pilot(s), . . . shall have

such grievance handled in accordance with the following procedures." *See* 2026 CBA

Excerpt, **Ex. E**.[7] The claims of the Class are not a grievance with FedEx.

88.     Section 21 System Board of Adjustment procedures do not apply to intra-union

grievances. Section 21 provides that it only applies to disputes with FedEx:

[Introduction]
As provided in Section 204, Title II of the Railway Labor Act, a System
Board of Adjustment is established for the purpose of adjusting and deciding
grievances which arise under the terms of this Agreement and have been
processed under Section 19 or Section 20 of this Agreement which are
properly brought before it in a timely fashion. The System Board of
Adjustment shall be known as the Federal Express Pilots' System Board of
Adjustment (hereinafter referred to as "the System Board").

A. Jurisdiction
2.      The non-disciplinary System Board shall have jurisdiction over
        disputes between a pilot(s) or the Association and [FedEx] growing
        out of grievances, or out of the interpretation or application of any of
        the terms of the Agreement, which have been processed under
        Section 20, and which have been submitted to the System Board as
        provided in Section 21.B.

*Id.*

89.     The System Board of Adjustment (Section 204 of the RLA) only hears cases

involving employees against the company. System Boards of Adjustment have no

jurisdiction over disputes between employees and their union. Therefore, there are

no administrative remedies to exhaust.

---

[7] Plaintiffs do not currently have a copy of an executed 2026 CBA. Upon information and belief, the 2026 CBA incorporates Section 20 and 21 from the 2015 CBA. Therefore, 2015 CBA provisions are attached.

[A] suit against the union for breach of its duty of fair representation is not within the jurisdiction of the National Railroad Adjustment Board or subject to the ordinary rule that administrative remedies should be exhausted before resort to the courts. The claim against the union defendants for the breach of their duty of fair representation is a discrete claim quite apart from the right of individual employees expressly extended to them under the Railway Labor Act to pursue their employer before the Adjustment Board.

*Czosek v. O'Mara*, 397 U.S. 25, 27-28, 90 S. Ct. 770, 772-73 (1970) (citations omitted).

90.    The Section 21 System Board does not have the power to hear this dispute between Plaintiffs and their union, ALPA.

But § 3 First (i) by its own terms applies only to "disputes between an employee or group of employees and a carrier or carriers." This case involves no dispute between employee and employer but to the contrary is a suit by employees against the bargaining agent to enforce their statutory right not to be unfairly discriminated against by it in bargaining. The Adjustment Board has no power under § 3 First (i) or any other provision of the Act to protect them from such discrimination. Furthermore, the contract between the Brotherhood and the Railroad will be, at most, only incidentally involved in resolving this controversy between petitioners and their bargaining agent.

*Conley v. Gibson*, 355 U.S. 41, 44-45, 78 S. Ct. 99, 101 (1957).[8]

91.    A System Board of Adjustment is a creature of statute. Its jurisdiction is limited to its statutory grant of authority, which cannot be extended by the union or anyone else:

The authority or jurisdiction of the System Board is statutory, 45 U.S.C.A. § 184. It cannot be extended by agreement of the parties, for it is not a private board of arbitration.

*Am. Airlines v. Air Line Pilots Ass'n, Int'l*, 91 F. Supp. 629, 632 (E.D.N.Y. 1950); *see also Brady v. Trans World Airlines, Inc*, 167 F. Supp. 469, 471 (D.

---

[8] *See also Verville v. Int'l Ass'n of Machinists & Aerospace Workers*, 520 F.2d 615, 618 (6th Cir. 1975) ("An airline System Board of Adjustment does not have jurisdiction of a dispute between a union and a union member.").

Del. 1958) ("The fact that the dispute might encompass construction of the collective bargaining agreement is deemed entirely irrelevant for unless the controversy is between employee and employer the Board is simply without jurisdiction and no agreement of the parties can extend its authority.").

92.    The Section 21 System Board lacks the authority to issue a binding order in this dispute. "When arbitration board ventures outside scope of authority conferred on it by collective bargaining agreement, it lacks power to bind parties." *Northwest Airlines, Inc. v. Air Line Pilots Asso. International,* 530 F.2d 1048 (D.C. Cir. 1975) (citing *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)).

93.    The district court has jurisdiction over Plaintiffs claims against Defendant.

"Since the duty of fair representation arises under both the RLA and the NLRA and both acts regulate commerce, *28 U.S.C. § 1337 provides jurisdiction for district courts to consider unfair representation claims*."

*Fechtelkotter v. Air Line Pilots Assoc., Int'l,* 693 F.2d 899, 903 (9th Cir. 1982) (emphasis added) (citations omitted).

94.    This court must decide any question of arbitrability of Plaintiffs' claims against Defendant. *See CareFlite v. Office & Prof'l Emples. Int'l Union*, 612 F.3d 314, 322 (5th Cir. 2010) (citing *In re Contintental Airlines, Inc.*, 484 F.3d 173, 183 (3d Cir. 2007)) ("'The RLA does not dispense with the preliminary question of arbitrability,' and therefore court must examine CBA to see whether parties have agreed to arbitrate dispute in question.").

95.    There are no administrative procedures available to Plaintiffs. Plaintiffs may file their action against Defendants in federal district court without taking any administrative action.[9]

**COUNT I: BREACH OF DUTY OF FAIR REPRESENTATION**

96.    Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS incorporate all previous paragraphs into this Count I as if fully alleged herein.

97.    ALPA has a duty of fair representation to Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS and the Class. The Class consists of active pilots during the amendable period whose wages were used by ALPA to negotiate the amount of money FedEx would set aside for the retroactive payment in the 2026 LOA. ALPA also had a duty to the Class by including them in the 2026 LOA.

98.    As ALPA had done in years past, it established a per-capita (i.e., months X dollars) methodology for retroactive payments in the 2026 LOA.

99.    However, ALPA failed to follow precedent for per-capita retroactive payments to FedEx pilots. In past LOAs, pilots were proportionally for months in which they were active pilots.

100.    Instead, ALPA applied a different, wage-based (i.e., money earned X percentage) methodology for retroactive payments to the per-capita methodology.

101.    The wage-based model (followed by SWAPA and by ALPA on behalf of United Airlines), which had increasing percentages year-over-year, sought to approximate the rate of wage increases pilots would have had if the new CBA was in effect during

---

[9] Simultaneously herewith, Plaintiffs have initiated a protective grievance proceeding solely to protect against a limitation defenses. The protective grievance only states that the Section 20 and 21 procedures described in the CBA are not applicable to this dispute and the System Board has no jurisdiction.

the amendable period. At those airlines, assuming a 2020 start date, a pilot who retired in 2022 received retroactive pay consistent with 2020–22 wages, while a pilot who retired in 2024 received retroactive pay consistent with 2020–24 wages.

102. But when the wage-based methodology is applied to a per-capita model–and compounded with a dollar figure that dramatically and arbitrarily increases year-over-year–the result is a retroactive payment methodology that rewards pilots who were active at the end of the amendable period and discriminates against those who were active but then retired (often mandatorily under federal law), even if the currently active pilots worked much less or were a lower rank than the retirees.

103. ALPA's allocation methodology was devised in bad faith. The NC, which does not have authority under the Manual to make decisions on allocations, shut out the MEC, which does have such authority, from development of the methodology.

104. Then, the NC, whose new leader needed to justify his promises to currently active pilots, and/or ALPA counsel, sold the methodology it devised to the MEC as being consistent with other airlines, when it was not, and assured the MEC that a vote would not expose ALPA to legal action by making false and misleading statements about such exposure.

105. ALPA's actions with respect to Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS and the Class were so far outside a wide range of reasonableness as to be irrational, and therefore are arbitrary for a duty of fair representation claim.

106. In a further effort to shield their bad faith conduct from liability, the NC attempted to adopt a dispute resolution procedure before a System Board that is in large part

selected by the union itself. *See Brady v. Trans World Airlines, Inc*, 167 F. Supp. 469, 472 (D. Del. 1958) ("It is simply repugnant to our standards of fundamental fairness and totally unrealistic to require an employee to submit a dispute he has with his bargaining agent for final determination to persons selected by and representing the bargaining agent. The decisional law and the legal literature are replete with condemnation of this practice.").

107. Therefore, ALPA breached its duty of fair representation to Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS and the Class.

108. Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS and the Class are entitled to damages.

## CONCLUSION

WHEREFORE, Plaintiffs GREG HANSEN, RUDI KOHLBACHER, and RICHARD ZINS and the Class demand judgment against Defendant ALPA, plus costs, attorney fees, and all other relief the Court deems just and proper.

Respectfully submitted,

_____
Frank L. Watson, III TN Bar # 015073
WATSON BURNS, PLLC
5865 Ridgeway Center Parkway, Suite 300
Memphis, Tennessee 38120
Telephone (901) 529-7996
Facsimile (901) 529-7998
Email:  fwatson@watsonburns.com

-and-

Randall K. Calvert, OBA #14154
*(Pending Pro Hac Vice Motion)*
John R. (Jack) Bomhoff, OBA #32356
*(Pending Pro Hac Vice Motion)*
CALVERT LAW FIRM
1041 NW Grand Boulevard
Oklahoma City, Oklahoma 73118
Telephone (405) 848-5000
Facsimile (405) 848-5052
Email:  rcalvert@calvertlaw.com
            jbomhoff@calvertlaw.com

-and-

Jacie Zolna, IL # 6278781
*(Pending Pro Hac Vice Motion)*
Ben Swetland, IL # 6307138
*(Pending Pro Hac Vice Motion)*
ZOLNA SWETLAND, LLC
30 N. LaSalle St., Suite 2300
Chicago, Illinois 60602
Telephone (312) 724-8474
Email:  jzolna@zolnaswetland.com
            bswetland@zolnaswetland.com

***Attorneys for Plaintiffs***

**Jury Trial Demanded**
**Attorney's Lien Claimed**